Filed 10/26/22  P. v. Casados CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079543 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SWF2007416) |
| JEREMY PHILLIP CASADOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Timothy F. Freer, Judge.  Affirmed in part, reversed in part and remanded with directions.

Kevin D. Sheehy, by appointment of the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Jeremy Phillip Casados of voluntary manslaughter and the trial court sentenced him to the upper term of 11 years, plus an additional 10 years based on a firearm sentencing enhancement. Casados does not dispute the conviction, but asserts he is entitled to resentencing under the ameliorative sentencing provisions of recently-enacted Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567). The Attorney General agrees the amended sentencing provisions apply retroactively. But he argues remand is not necessary because the trial court relied on the undisputed fact that Casados was on probation when he committed the crime, as one factor among many, in imposing the upper term. We disagree that Casados's submission on the probation violation, for expediency in being sentenced to time served on that violation, amounted to a stipulation that it could be considered as an aggravating factor for the purpose of sentencing him to the upper term on the voluntary manslaughter charge under the new law. And, as the Attorney General concedes, it is not reasonably likely the jury would have found the remaining aggravating factors true, nor can we conclude that the trial court would have imposed the same sentence in the absence of those additional factors. We hold the error was not harmless and remand the matter for resentencing. We affirm the judgment in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

On the Fourth of July morning in 2020, Casados shot his girlfriend's friend, Kerry O., in the chest at close range with a rifle, killing him. The People charged Casados with the deliberate and premeditated murder of Kerry (Pen. Code,[1] §§ 187, subd. (a), 189), and alleged he intentionally

---

[1] All further undesignated statutory references are to the Penal Code.

discharged a firearm during the commission of the murder, causing death (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8)). Casados admitted he shot Kerry but claimed he did so in self-defense, or in the heat of passion due to provocation.[2]

Casados had been in a tumultuous on-again, off-again relationship with Kelly C. for about eight years. They had a daughter together, who was three years old at the time of the shooting. Kelly met the victim, Kerry, through a mutual friend, a year or two before the shooting. Kelly believed Kerry was pursuing a sexual relationship with her, and Casados suspected Kelly was cheating on him with Kerry.

Casados's first encounter with Kerry occurred in January 2020. At that time, Casados was spending about five nights a week at Kelly's house, with Kelly and their daughter. Kerry came over to the house one day while Casados was out. Casados returned to find Kelly and Kerry sitting together at a workbench table in the garage. Casados did not want Kerry there. Casados told Kerry to "[g]et the fuck out," and the two men got into a physical confrontation. Kelly testified Casados was carrying a BB gun when he entered the house, and it was Casados who first "went after" Kerry. The two men wrestled on the ground, and Kerry ended up sitting on top of Casados until Casados got tired and stopped fighting. After a few minutes, they stood up and Casados left. Kerry told Kelly he could not believe he had almost killed Casados over "a toy," meaning the BB gun.

According to Casados, when he insisted that Kerry leave, Kerry "jumped up," pulled a knife from the waistband of his pants, and moved

---

[2] The jury was instructed with CALCRIM No. 570, voluntary manslaughter (heat of passion), and CALCRIM No. 571, voluntary manslaughter (imperfect self-defense or imperfect defense of another).

3

towards him. Casados testified Kerry pushed him into a car that was parked in the garage, got him down on the ground, and held the knife to his neck. Kerry told Casados he was "going to kill" and "bury" him, and "[n]o body, no crime." Kerry eventually got off Casados. Casados then ran into the house to check on Kelly and their daughter. Kelly asked Casados to leave, and he did.[3]

Kerry returned to Kelly's house "several times" in the next couple of months. Kelly would not answer the door, or her phone, at least when Casados was at the house. Kelly figured Kerry "would go away" if she ignored him, but he did not. Casados called 911 three times in January and twice in February of 2020 to complain about Kerry stalking Kelly and showing up at the house, making threats. The audio recording of each 911 call was played for the jury. In the calls, Casados reported that Kerry was banging on the doors, and either threatening him or threatening to burn down the house if Kelly did not come out. Law enforcement came to the house each time, but, according to Casados, it sometimes took up to three hours for them to arrive. Casados claimed law enforcement did not do anything to solve the ongoing problem of Kerry's threatening behavior.

Kelly changed her phone number sometime in February 2020. She did not have much interaction with Kerry for several months after. But, one day in June, Kerry stopped by the house unannounced. Casados was not around. Kerry was cordial, and was not threatening towards Kelly in any way. Kelly's mother stopped by with some groceries while Kerry was there. She

---

[3]    Later, when asked about Kelly's assertion that he had a BB gun on cross-examination, Casados testified he got the BB gun when he went to check on his daughter. He pointed the gun at Kerry and was going to tell him to get out, but Kerry rushed him and took the gun away.

4

had forgotten to get diapers for Kelly's daughter, so Kerry offered to go get the diapers. He dropped them off later that day but did not stay.

The next time Kelly or Casados saw Kerry was on July 3, 2020, the day before the shooting. Casados had stayed over at Kelly's house the night before. Kerry arrived around 9:00 in the morning and spent most of the day at the house. Kelly observed that "everybody was cool," and it seemed like Kerry and Casados were not "hanging onto resentments." Casados, on the other hand, testified he did not want Kerry at the house, but did not protest because he was scared Kerry would attack him if he did. He said Kerry was nice to him when Kelly was around, but "kept trying to get rid of [him]" whenever she was not.

Kerry left a few times throughout the day, for about an hour or so each time, but he always came back. Kerry brought food, alcohol, and marijuana to the house, which he shared with Kelly and Casados. Kelly testified she did not allow smoking in the house, and so Kerry and Casados were hanging out together in the garage most of the day. Casados testified he did not accept any alcohol or marijuana from Kerry. He testified he was not really interacting with Kerry, but Kerry threatened to kill him several times throughout the day. Kerry told Casados: "I ain't going nowhere. I had sex with your girl all over the house. Can't wait for your daughter to get big enough." Casados testified Kerry also told him: "I'm going to bury you. No body, no crime."

Kelly went to bed at about 10:00 that night, leaving Casados and Kerry alone in the garage. Kerry left again sometime before 2:00 in the morning to get cocaine, according to Casados. Casados testified Kerry threatened him, Kelly, and their daughter right before leaving. While Kerry was gone, Casados went to the attic to get a .22 caliber rifle that he had previously left

5

there.[4]  Casados then went to the bedroom where Kelly was lying down with their daughter.  He woke Kelly and told her she needed to make Kerry leave.

According to Kelly, Casados said Kerry told him that they (Kerry and Kelly) "had sex all over the house."  Casados told Kelly, "I'm going to kill him."  Kelly took the gun from Casados and placed it in the closet.  She then went to the garage to speak with Kerry, who returned right around the same time.  Kelly testified she had a "calm" conversation with Kerry in the garage.  Kerry agreed to leave the house but asked to use the restroom first.  Kelly started looking at her phone as Kerry went inside.  She did not see what happened next, but heard a loud noise, like a "party popper," and then everything went silent.

Casados testified he stayed in the house, but could hear Kelly and Kerry talking in the garage.  Kerry's voice got louder and Casados heard him saying, "fuck this, fuck that."  Casados got the gun from the closet.  He testified he "was afraid [Kerry] was going to kill [him]."  Casados moved towards the garage, and saw Kerry coming up a ramp from the garage into the house.  Casados testified he told Kerry, "Leave or I'll shoot," but Kerry did not stop.  Casados pulled the trigger.  Kerry took a couple of steps back and fell to the ground.[5]

The jury found Casados not guilty on the charges of first and second degree murder (§ 187, subd. (a)), but guilty of the lesser included offense of

---

[4]  Casados testified he had put the rifle in the attic months earlier, but explained he had moved it, and another gun, from a closet in the house so his daughter would not be able to access them.

[5]  Kerry had a pair of brass knuckles on one hand.  Casados testified he did not recall seeing the brass knuckles before he shot Kerry, but did see them once Kerry was on the ground.

voluntary manslaughter (§ 192, subd. (a)).  The jury also found true the allegation that Casados intentionally discharged a firearm, causing death to another person (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8)).  After discussing a number of aggravating and mitigating factors, the trial court sentenced Casados to the upper term of 11 years on the voluntary manslaughter conviction, plus an additional 10 years based on the firearm sentencing enhancement,[6] for a total prison term of 21 years.

DISCUSSION

Casados's sole contention on appeal is that the matter must be remanded for resentencing in light of Senate Bill 567's amendment to section 1170, subdivision (b).  We agree.

At the time Casados was sentenced, section 1170, former subdivision (b), left it to the sentencing judge's "sound discretion" to select the appropriate term within a sentencing triad that "best serves the interests of justice."  (§ 1170, former subd. (b), as amended by Stats. 2018, ch. 1001 (Assem. Bill No. 2942) § 1.)  While Casados's appeal was pending, the Legislature enacted Senate Bill 567, which made significant amendments to the determinate sentencing law under section 1170, former subdivision (b).  (Stats. 2021, ch. 731, § 1.3.)  As the parties agree, the amendments to section 1170, subdivision (b), effected by Senate Bill 567 are ameliorative and apply retroactively to Casados's case, which was not final on the enactment's operative date, under the *Estrada* rule.  (See *In re Estrada* (1965) 63 Cal.2d

---

6    Because the jury found Casados guilty of the lesser included offense of voluntary manslaughter, which is not an enumerated offense under section 12022.53, the trial court converted the jury's finding pursuant to section 12022.53, subdivision (d), to a finding pursuant to section 12022.5, subdivision (a), without objection from either party.

7

740; *People v. Lopez* (2022) 78 Cal.App.5th 459, 465 (*Lopez*) ["The People properly concede that Senate Bill No. 567's ameliorative amendments to section 1170, subdivision (b) apply retroactively to all cases not yet final as of January 1, 2022."].)

Effective January 1, 2022, a "court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) Here, the trial court found multiple aggravating factors to justify selecting the upper term of 11 years on the voluntary manslaughter charge, none of which complied with the new law.

First, the court found the crime involved great violence, great bodily harm, and a high degree of cruelty or viciousness. Although acknowledging the jury's conviction of only voluntary manslaughter, the court stated it "appeared to the [c]ourt that given the People's evidence as to the location of the wound, the location of . . . [the victim's body], Mr. Casados's own testimony during the trial . . . [that the victim] didn't have much of a chance the moment that he got to that entrance," it "appeared" this was a "cold killing, whether you believe it was under the murder of first degree or second degree or voluntary manslaughter." The court also found that Casados "tried nothing to assist [the victim] to prevent him from dying," which the court found "very disturbing" about Casados's conduct. Second, the trial court found Casados was armed with a weapon. Third, it found Casados engaged in violent conduct that indicates he is a danger to society. Fourth, it found

8

Casados had served a prior term in county jail. And fifth, the court found Casados's prior performance on probation was unsatisfactory.

It is undisputed that at least the first and third factors in aggravation—the crime involved great violence, great bodily harm, and a high degree of cruelty or viciousness and Casados engaged in violent conduct that indicates he is a danger to society—were not stipulated to by Casados or found true beyond a reasonable doubt by a jury. In addition, the trial court could not rely on the jury's finding on the gun enhancement allegation to support the second aggravating factor—Casados was armed with a weapon—as the Attorney General properly concedes. Section 1170, subdivision (b)(5), precludes the court from imposing an upper term "by using the fact of any enhancement upon which sentence is imposed under any provision of law." And, as California Rules of Court, rule 4.420(g) provides, "[t]o comply with section 1170[, subdivision ](b)(5), a fact charged and found as an enhancement may be used as a reason for imposing a particular term only if the court has discretion to strike the punishment for the enhancement and does so." Here, the trial court declined to strike the firearm enhancement. Thus, to the extent the trial court relied on the jury's finding on the firearm enhancement allegation as an aggravating factor in imposing the upper term on the voluntary manslaughter conviction, it did not comply with the requirements of section 1170, subdivision (b)(5).

Despite these concessions, the Attorney General argues reversal is not required because any error was harmless. Relying on *People v. Flores* (2022) 75 Cal.App.5th 495 (*Flores*), the Attorney General asserts the trial court's imposition of the upper term on the voluntary manslaughter conviction may be upheld as long as a jury could have found *a single* aggravating circumstance true beyond a reasonable doubt. Here, the Attorney General

9

contends, Casados effectively stipulated to the fifth aggravating factor—his performance on probation was unsatisfactory—and so, the Attorney General argues, that factor alone precludes Casados from obtaining relief based on Senate Bill 567. For two reasons, we reject the Attorney General's contention.

First, Casados did not stipulate to the probation violation as an aggravating factor to be considered by the court in sentencing on the voluntary manslaughter charge. At the start of the sentencing hearing, the trial court noted Casados had a trailing misdemeanor probation case,[7] and asked the parties how they intended to proceed. Defense counsel stated his "expectation" was that the trial court would find Casados in violation of probation "in light of the trial and terminate probation with credit for time served and [then] strike all the fines." The People agreed. The court took judicial notice of the jury's verdict on the charge of voluntary manslaughter, and found Casados to be in violation of his probation in the trailing misdemeanor case. The court sentenced Casados for time served for the probation violation, and struck all associated fines and fees, as the defense had requested. The court later considered Casados's unsatisfactory performance on probation as one aggravating factor, among many, in electing to impose the upper term on the voluntary manslaughter conviction.

Under new section 1170, subdivision (b)(3), the trial court could consider Casados's prior convictions based on a certified record of those

_____

[7] According to the probation report, Casados was sentenced to 36 months summary probation for driving under the influence of alcohol in violation of Vehicle Code section 23152, subdivisions (a) and (b) in 2003. His probation was revoked, and a bench warrant issued, for an unspecified violation in 2005. In April 2021, a probation hearing was set for June 18, trailing the murder case.

10

convictions without submitting them to a jury.  But, as we have explained, at the time of the sentencing hearing, the law did not yet require that all other facts underlying the aggravating factors relied on by the trial court be either stipulated to or found true beyond a reasonable doubt by the jury.  Thus, Casados did not have the same "incentive and opportunity" to challenge the probation violation, as he would have under new section 1170, subdivision (b).  (See *People v. Sandoval* (2007) 41 Cal.4th 825, 839–840 (*Sandoval*) ["Counsel's strategy might have been different had the aggravating circumstances been tried under a beyond-a-reasonable-doubt standard of proof to a trier of fact that was responsible only for determining whether such circumstances were proved (and not for making the ultimate sentencing decision).”].)  Instead, as would routinely happen when a defendant has been convicted of a felony and is about to be sentenced to a lengthy prison term, Casados submitted to a probation violation as a matter of expediency.  We therefore decline the Attorney General's invitation to consider his submission on the probation violation as a stipulation to the aggravating factor of unsatisfactory performance on probation for the purposes of sentencing under new section 1170, subdivision (b).

Second, even if we were to accept Casados's submission on the probation violation as a stipulation for the purpose of sentencing, we disagree with the Attorney General's position that a stipulation on *this* single aggravating factor is sufficient to establish harmless error.  The Attorney General relies solely on *Flores*, in which the trial court imposed an upper term sentence based on the defendant's "numerous prior convictions" and unsatisfactory performance on probation, before enactment of Senate Bill 567.  (*Flores, supra,* 75 Cal.App.5th at p. 500.)  As the appellate court explained, both factors were readily established by the probation report,

11

which the trial court reviewed and considered.  (*Id.* at p. 501.)  Relying on *Sandoval*, the court concluded the error was harmless because " 'the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury.' "  (*Flores,* at p. 500, quoting *Sandoval, supra,* 41 Cal.4th at p. 839.)

But, *Sandoval* was decided solely on Sixth Amendment grounds, before enactment of Senate Bill 567 and its amendments to section 1170, subdivision (b).  (See *People v. Dunn* (2022) 81 Cal.App.5th 394, 406 (*Dunn*) [explaining that *Sandoval* considered whether an upper term imposed under the prior determinate sentencing law was harmless error under the Sixth Amendment].)  As amended, section 1170, subdivision (b)(2), permits the imposition of the upper term *only* where the facts underlying *each* of the aggravating circumstances the trial court relies on, with the exception of certified records of convictions, has been stipulated to or found true beyond a reasonable doubt by the jury.  In this context, as we explained in *Lopez*, "the presence of a single valid aggravating factor is insufficient to permit a reviewing court to affirm a sentence imposed in violation of the *revised* version of section 1170, subdivision (b)."  (*Lopez, supra,* 78 Cal.App.5th at p. 466, fn. 10, italics added; see also *id.* at p. 467, fn. 11 [disagreeing with *Flores*]; accord *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1112 (*Zabelle*) ["even if we find the jury would have found true at least one of the aggravating circumstances that the trial court relied on, we still must grapple with the trial court's reliance on other aggravating circumstances inconsistent with the current requirements of section 1170"]; *Dunn,* at p. 406 ["We respectfully disagree with the People and *Flores* that *Sandoval* applies in this context.  A reviewing court concluding beyond a reasonable doubt that

12

the jury would have found the facts underlying *a single circumstance in aggravation* true beyond a reasonable doubt is insufficient to conclude that any error under section 1170, subdivision (b) was harmless."].)

Where, as here, a trial court relies on *multiple* aggravating factors, but only one of those factors was arguably stipulated to, or necessarily would be found true beyond a reasonable doubt by a jury, we must *also* consider whether the trial court's failure to comply with the requirements of new section 1170, subdivision (b)(2), by also considering *other* aggravating factors were harmless as well. (See *Lopez, supra,* 78 Cal.App.5th at pp. 466–467.) As our sister court in *Zabelle* recently explained, "it is not enough that we find the trial court *could* have imposed the upper term sentence (based on the conclusion that the jury would have found true at least one aggravating circumstance). Rather, to find harmless error for the state law error [under new section 1170, subdivision (b)(2)], we must find that the trial [court] *would* have imposed the upper term sentence even absent the error. In particular, we must consider whether it is reasonably probable that the trial court would have chosen a lesser sentence in the absence of the error." (*Zabelle, supra,* 80 Cal.App.5th at p. 1112.)

Thus, even if we were to assume there was no error in the trial court relying on Casados's unsatisfactory performance on probation as *one* aggravating factor, we agree with *Lopez*, and *Zabelle*, that a second inquiry is necessary. (*Lopez, supra,* 78 Cal.App.5th at pp. 466–467.) We would still need to determine whether the jury would have found any additional factors the trial court relied on true beyond any reasonable doubt and, if not, "whether there is a reasonable probability that the trial court would have selected a term other than the upper term if it had relied solely on a subset of

13

the original factors on which it previously relied." (*Id.* at p. 466, fn. 10.) On the record before us, we cannot reach either conclusion.

Here, unlike *Flores*, it is apparent from the record that the trial court's decision to impose the upper term was based primarily on aggravating factors *other* than Casados's unsatisfactory performance on probation.[8] As noted, Casados was on probation for a 2003 misdemeanor conviction. "[C]onsidering the recency and frequency of [Casados's] prior crimes" as a whole, the court concluded Casados's criminal history was a *mitigating*, not aggravating, factor. Although the court did list Casados's unsatisfactory performance on probation, as well as his prior term in county jail, as aggravating factors, the vast majority of the court's comments in explaining its decision to impose the upper term were focused on the circumstances of the shooting itself.

Further, as the Attorney General effectively concedes, there is reason to believe the jury would *not* have found the additional facts relied on by the trial court to be true beyond a reasonable doubt, if given the opportunity. Indeed, some of the trial court's comments appear to contradict the jury's verdict. Although the jury acquitted Casados of first and second degree murder, the trial court found the shooting was a "cold killing." The court also seemed to discount the jury's implied finding of self-defense in reaching its verdict of guilty on voluntary manslaughter. In commenting on whether the victim had "much of a chance" before Casados shot him, the court stated: "In

---

8     We note that it is not readily apparent whether the trial court in *Flores* considered any *other* aggravating factors, besides the defendant's prior convictions and unsatisfactory performance on probation. Regardless, as we explain, here, it is apparent the trial court did rely on multiple other aggravating factors and, for the reasons articulated, we agree with *Lopez* that a second inquiry is necessary to evaluate harmlessness. (See *Lopez, supra,* 78 Cal.App.5th at pp. 466–467.)

the traditional values that American justice and outlaws used to have in the Old West, or unwritten themes, you never shot a person in the back and you never shot an unarmed man." The court also stated it did not believe there was "a showing or demonstration the defendant was provoked," despite acknowledging the jury was also instructed that it could "consider the provocation in deciding whether the crime was first[ ] or second[ ]degree murder." But the jury found Casados guilty only of voluntary manslaughter, and so it must have accepted one of the defense's alternate theories to malice.

We recognize the approach to assessing the harmlessness of the state law error recently articulated by the courts in *Zabelle* and *Dunn* differs slightly from this court's approach in *Lopez*. In *Lopez*, this court explained, "the initial relevant question . . . is whether the reviewing court can conclude beyond [a] reasonable doubt that a jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied in exercising its discretion to select the upper term." (*Lopez, supra,* 78 Cal.App.5th at p. 467, fn. 11.) We explained that "[i]f the answer to this question is 'yes,' then the defendant has not suffered prejudice from the court's reliance on factors not found true by a jury in selecting the upper term." (*Ibid*.) But if the answer to the question is " 'no,' " we go to a second step and ask "whether a reviewing court can be certain, to the degree required by *People v. Watson* (1956) 46 Cal.2d 818, 836 [(*Watson*)] . . . , that the trial court would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only a single one of the aggravating factors, a few of the aggravating factors, or none of the aggravating factors, rather than all of the factors on which it previously relied. If the answer to both of these questions is 'no,' then it is clear that remand to the trial court for resentencing is necessary." (*Ibid*.)

15

In *Dunn*, the court agreed "with *Lopez* on the majority of the standard it articulated," but concluded only "one aggravating circumstance must be reviewed pursuant to [*Chapman v. California* (1967) 386 U.S. 18]." (*Dunn, supra,* 81 Cal.App.5th at pp. 408, 409.) It held, "the remaining aggravating circumstances involve only a state-created right to a jury trial that must be reviewed pursuant to *Watson*." (*Ibid.*) Likewise, in *Zabelle*, the court agreed with *Lopez* that a two-step process is necessary, but held, "a reviewing court must always evaluate for *Watson* error before concluding that the trial court's error was harmless." (*Zabelle, supra,* 80 Cal.App.5th at p. 1113.) But, as the *Zabelle* court noted, its "quibble with *Lopez* is a very minor one. Both [its] approach and the *Lopez* court's approach are the same in terms of outcomes." (*Ibid.*)

This is particularly true here, where the Attorney General concedes, it cannot "reasonably argue that the jury would have found each of [the] circumstances in aggravation [that the trial court considered] true beyond a reasonable doubt." Nor can we conclude, to the degree required by *Watson*, that the trial court would have exercised its discretion to select the upper term if it had not *also* relied on those additional aggravating factors. Consequently, we cannot conclude the error in this case was harmless under

16

any variation of the applicable standard of prejudice, as articulated in *Lopez, Dunn,* or *Zabelle*.[9],[10]

## DISPOSITION

The conviction is affirmed and the sentence is vacated. The matter is remanded to the trial court for resentencing consistent with the recent amendment to section 1170. Following resentencing, the trial court is to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

---

[9]    Casados asserts, in a somewhat conclusory fashion, that the trial court similarly erred by imposing the upper term on the firearm enhancement based on aggravating factors that were neither stipulated to nor found true by the jury. The Attorney General does not directly address this contention, but also does not identify any aggravating factor that the court did rely on in sentencing Casados on the firearm enhancement that was either stipulated to or found true by the jury beyond a reasonable doubt. In any event, because we are already remanding for resentencing, the trial court shall reconsider Casados's full sentence, including the sentence on the firearm enhancement, in accordance with the recent amendment to section 1170, subdivision (b). (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 [full resentencing is appropriate on remand].)

[10]    Casados also requests, for the first time in his reply brief, that this court use its sua sponte authority to direct that a different judge preside over his resentencing. We decline to do so. (See *People v. Gulbrandsen* (1989) 209 Cal.App.3d 1547, 1562 ["statutory power of appellate courts to disqualify sentencing judges should be used sparingly and only where the interests of justice require it"].)

17

DO, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.